May it please the Court, my name is Martha Hall, I represent Appellant Bennett, and first I'd like to apologize. I am the owner of the offending cell phone that rang earlier in court, and I had stepped out of the courtroom just when it rang. Now, had my name been placed on the cell phone as a name tag, that would be a mechanical trace, which under the prior case law of this circuit would be admissible to prove the ownership of that cell phone. That is the point of origin of the cell phone. So we could have taken it as circumstantial evidence, but you've given us a confession. That's right. I've given you a full admission. I fall on the sword. However, in this case. The lesson to be learned is whether you leave it or not, always turn off cell phones when you enter a courtroom. Yes, Your Honor. Yes, Your Honor. That is a hard lesson to learn sometimes. Right. Your Honor, in this case, however, with regard to the mechanical trace rule, the GPS testimony of Officer Chandler does not come within the mechanical trace rule. The mechanical trace rule pertains to tags, brands, or labels placed on objects, objects which are themselves introduced into evidence. When the tags or the brands are then circumstantial evidence of the point of origin or ownership of the object. Here, the GPS machine was never introduced into evidence. And the disputed evidence is not a tag or some sort of evidence of origin, but rather extensive information which Chandler claims was displayed somehow by the GPS machinery. In other words, we're not arguing about a name tag on the GPS machine. We're not arguing about a tag which says it was made in China. As with the firearm in Alvarez, we're not... Let's suppose this hypothetical. Let's suppose that the question had been whether he'd crossed the border and the only evidence that the agent had was tire tracks taking him off ocean and onto land. And the only evidence he had was the tire tracks that crossed the border. And he looked back because there was dirt road or whatever. So the tire tracks from the truck in which the defendant was located in this hypothetical went back and crossed the border. Would it be permissible for the agent to testify about his observations of that? Well, I think that it may be admissible, but I think that that's a far cry from data that is produced by a machine that is a sophisticated piece of technology to which Mr. Bennett had no access. And about which Mr. Bennett was unable to even present any expert testimony about GPS machinery. I mean, basically what happened in this case is that Mr. Bennett was blindsided by the GPS machinery information. He made all of the appropriate objections and the judge just summarily overruled them and let in this information, which is... It's data. It's more analogous to a story. It's more analogous to someone saying the journey began in Mexico and it went from Mexico. And this is the testimony of Chandler, actually. And he said the journey, according to the GPS machine, began in Mexico off of the Bull Ring, went over to the islands or went to the islands and then the Bull Ring, and then went across the border into the United States, past Imperial Beach, up to Point Loma, and that's where we are now. That's a far cry from tire tracks or footprints. That is a story. And it's produced by this particular machine. And Mr. Bennett had no access to it. It just does not come within the name tag or point of origin information in the cases cited by this court in the court's order. Let's suppose we agree with that and say that it was error for the GPS to come in over a hearsay objection. How does that ultimately affect your case, then? Well, I think that it would require reversal. It's obvious that the GPS information was very critical because the jury came back and asked for the GPS information to be read back to them. And, you know, shortly thereafter they returned their verdict. It was information that supported the government's theory that Mr. Bennett was importing the marijuana, meaning that he was bringing it from Mexico. And it was the only information, other than some questionable statement, that Mr. Bennett crossed the border. And it was information that supported why he would be in possession of a large quantity of marijuana. That wasn't what led the officers initially to conclude that Mr. Bennett had crossed the border, was it? This was not discovered until later on. Right. But the officers standing on the shoreline watching boats coming in, how far away is the officer from Mr. Bennett at the time he sees him? How far away is the officer from Mr. Bennett at the time he sees him? Several miles. Okay. So he's looking through. And how far is Mr. Bennett from the border at the time that the officer sees him? I believe that he is several miles. I think that he is like around two to three miles at least from the border. Two to three miles inside the U.S. border? Yes, I believe so. Although I don't have a map in front of me. He was at Imperial Beach Pier, which is well within the U.S. border. And Point Loma is a pretty far distance from the Imperial Beach Pier. All the officers admitted that they had not seen him cross the border. The officer, James, who was perched on top of Point Loma claiming that he saw him off of the Imperial Beach Pier, which is a fair distance in itself, said that he assumed that he was coming from the direction of the border, hugging the coastline. And so that's why he drew that inference. So there was no evidence other than the GPS that he had actually- Doesn't Bennett at some point admit- Bennett made a statement to Officer Chandler. Now, part of what was admitted into the trial was a statement from Chandler, the testimony from Chandler that Bennett, he thought it was strange that Bennett would go to Mexico to go diving. You know, the government argues in response to my claim that that was a Miranda violation, that it was harmless error because that was just a non-responsive answer to the government's question. And that is a brief statement by Chandler, not the detailed- bull ring and then crossed the border and went up by Imperial Beach Pier, over up by Point Loma. The two are very different. The one piece of testimony from the GPS- And we never even saw a piece of data from the GPS. It's not even like he printed anything off the screen. I don't know if you can print it because I don't know these machines, you know, which is part of the problem. We have nothing from the GPS. We just have Chandler's recollection of what he saw, which gave him this very detailed information about the travels of Mr. Bennett on that boat that day, and goes on at length about it. I think LANS, the Los Angeles News versus CBS, actually supports reversal in this case because in LANS, after they find that the slate, the slate which is the tag saying it comes from West Group, is admissible, they then go on to say, we think that Fox's report of what he saw on the label in MTV's video library was inadmissible under the best evidence rule. Even assuming that the label's contents were not inadmissible hearsay, meaning they are admissible, LANS was required to produce the original label or duplicate, or at least explain why it cannot do so, and bring it within the best evidence rule, bring it within admission under the best evidence rule. Here we have none of that, none of that. And we have a piece of evidence which was critical to the government, which was argued in closing, and which was heavily relied on by the jury as evidence by the question and the return of the guilty verdicts after seeing that. Your Honors, I would just quickly like to respond to the gum sheet cases that the government provided me with this morning on waiver, which goes to the Fourth Amendment issue, I believe. I believe the government is attempting to circumscribe the number of arguments, and I think the government is really trying to get out of the holding of the Supreme Court and City of Edmond regarding the task force that was set up that day to interdict smugglers. However, what we have in this case is a Fourth Amendment attack on the search, and the government's response, which I did find fortunately with me this morning, although I don't have it in the excerpt of record, the government's response addresses the initial boarding of the boat by Officer James, gives their argument under Villamontes for that and why that is fine, and they also address the functional equivalent of the border argument, and then they go on to say that the boat was properly searched pursuant to its seizure. I think that it is not appropriate for the government to be arguing waiver when in its response to the motions, it covered this entire search from the initial stop all the way to the X-ray and gave all of its reasons for justification, and Mr. Bennett on appeal is responding to the arguments that were presented below by the government, and the court had all of the testimony before it from the initial stop onward. The cases cited on the gum sheet are cases where the district court didn't have the evidence that it would have needed to rule on the specific grounds during the hearing. Gumsheets? Gum sheets. Gum sheet. Well, I learn something new every day. Every day. You look like white paper to me. Okay. Thank you. Thank you, Your Honors. I see the stop sign is lit. Thank you very much. May it please the Court? Your Honors, my name is Michael Kaplan. I represent the United States in this matter. I was also the prosecutor at trial in this case as well. I'd like to address first the argument with respect to the mechanical trace. Obviously, the government sees it somewhat differently than the appellant in this case. It appears from the cases Alvarez and Snow that GPS would be right on the mark with a mechanical trace, and even more so than what were considered mechanical traces in the case of Alvarez. For example, the placard attached to the gun which said Garnica, Spain. The Court said, well, that's circumstantial evidence of origin. Was the gun in court? I'm sorry? Was the gun in court? I don't recall if the gun was in court. I understand what the Court's going on with that question. Even if the gun was in court, let me just respond. Let me backtrack a second and respond to her argument about the GPS not being in court. Noticeably absent from any motion the appellant ever filed, whether it was below or after trial, was the fact that they didn't have an opportunity to see the GPS, when in fact they clearly could have seen the GPS when it was available to the appellant before he pled guilty in this case. As the Court's aware from the procedural history, the appellant ran his motions. It was a two-day evidentiary hearing, at which time even appellant's counsel, which was a counsel for the appellant purposes, never raised the issue of not being able to see the GPS. Now, this case has gone on for quite some time, and I have to be honest with the Court. I don't recall specifically whether appellant's first counsel went out to actually view it, but I have to assume by the fact he never made much to do about its absence that he did have that opportunity. And beyond that, a case cited by appellant herself, or himself rather, U.S. v. Cowley specifically addressed this issue, and it said that live witness testimony suffices for the purposes of authenticity, and that's what we have. Well, how did he authenticate the GPS? He knows nothing about it. He doesn't know anything about the GPS's workability. He's an observer of something that came up on a screen. How does he know that the GPS was a properly functioning device? Well, he wouldn't know if it was properly functioning. All he could tell was from what the GPS said to him. Well, right. Right. Said to him. Right. But that's not – I'm sorry. What did it say to him? It didn't say the origin of the GPS machine. No, but it was. It was circumstantial evidence of the origin of the GPS. The GPS was attached to the boat. What the GPS does is it tracks origin backwards, and that's what it told the inspector. If it's operating correctly. If it's operating correctly. But they had opportunity to cross-examine Inspector Chandler with respect to whether it's operating correctly. How could they? Well, they could have at least approached the subject. Wait, wait, wait. Let me finish my question. I'm sorry. I won't interrupt you as much as I do, and I'm trying to understand. You're saying that Chandler, who is an observer of a machine on a boat, turns it on and sees the data points, the trace that shows up on the screen. Right. He knows nothing about where this GPS has been itself. He knows nothing about its origin. He knows nothing about its mechanical reliability. So what is there to cross-examine him about? All they can do is cross-examine him about the credibility of what he looked at on the screen. Right. And that's all that. How does that confront the out-of-court statement? Well, that assumes that this is actually here, that the GPS machine is a person or is a declarant for the purposes of a hearsay rule, which is primarily the government's argument that it's not. And for good reason. It's not a declarant because it is a machine, unlike the cases such that appellants cited, like a postmark or a postage mark in the Cowley case where this Court said, well, that really is an assertion of the postal inspector who put the mark on the envelope. GPS is not an assertion of any human being. GPS is – Who programmed it? Well, GPS has been – GPS is based upon coordinates that have been known to man since the beginning of tracking correlations. Coordinates? The machine, counsel. The machine has been operating in space for how long? I have no idea who programmed it. If whoever built it connected or put in the wrong data, it could generate false data, correct? That's a possibility. Some human being programmed this thing. It wasn't just – you know, it doesn't just come down as a stamp. It's an operating device that depends on relay from satellite. And if it's programmed incorrectly, it can provide false data, presumably, right? Assuming it was programmed incorrectly. Well, somebody programmed it. Some human being programmed it so that it would reflect on the screen mechanically what a human being intended it to do. There's a human being in this chain of command at some point. At some point, I agree. There would be. But there's more than one human being. I mean, Inspector Chandler was it? Right. I assume he knew how to read the GPS. He did. He was – in fact, the court even qualified him as an expert on the spot because of his – he was a marine. He was a senior marine enforcement officer. He operates a GPS machine in the due course of his business on a daily basis. He knew exactly how to operate the machine, how to look for the backtrack or the waypoints, and he explained that to the jury. Again, you know – What are the waypoints? How do those factor into whether the GPS is accurate or not? The waypoints clearly are input by a human being. No, the waypoints were input by the machine. They're automatically tracked by the machine. I thought there was testimony he acknowledged that the waypoints – he said the waypoints can be entered manually. I'm looking at excerpt of Record 74. I guess they could be entered manually, but the only way they could be entered manually in this case is if the appellant himself entered them. Well, I thought that was disputed. It says, so if someone had been out fishing, for example, and found a good spot, that can be marked in where that was, absolutely, or a diving spot or something like that. And you say some of these waypoints were entered around July of 1999. Right, but he distinguished those waypoints from the ones entered from that date from the ones he described coming up from Ensenada on that particular day, which were plotted automatically by the machine. In his testimony, he said every 15 minutes the machine automatically plots a point, and that's what he was testifying to. They automatically plotted points that he observed as he went back in the history of the machine, and that's what he was referring to in his testimony. Okay, so there are waypoints that could be inserted on top of the automatics? Absolutely, and he was referring to in his testimony regarding Ensenada, Mexico, as the ones that were automatically plotted, not the ones that somebody could have randomly put in in July or whenever to signal a good fishing spot. Counselor, is Officer Chandler's testimony about the GPS and those mechanical traces, that being introduced to prove that Mr. Bennett was indeed in Mexico and across the border? Circumstantially, yes. Okay, is it being used for any other purpose, as to justify reasonable suspicion, probable cause of anything subsequently that occurred? No. Just the circumstantial evidence that that boat was in Mexico at some point prior in that day. And, you know, it doesn't really have to say that the appellant was on the boat that day. It's just that that boat was in Mexico based upon the coordinates that were plotted automatically in the GPS. Let me move on, unless the Court has more questions on that particular area, with respect to the statements that came in. I just want to point out to the Court that the statement that appellant said, that it was strange that Bennett would go to Mexico to dive, is not actually a correct recounting of the testimony. What was said was, I thought it unusual that a person would go diving by themselves in Mexico. There was, I think from that statement, only you could say was a very tenuous, that statement was only tenuously related to the defendant, because the preceding question had to do with diving equipment. And I asked the inspector why it would be unusual that diving equipment was on board, the answer to which, I assume, was going to be no person would dive alone, which is what he said. But he said no person would go diving in Mexico by themselves. The jury would not necessarily have had to infer that came from Bennett, or the appellant himself, rather. It could have come from the fact that they observed the boat coming from Mexico, and Officer Chandler knew that, and he made that statement, or from the fact that GPS plotted it back in Mexico at some point in time, and there was testimony to the GPS. So although that came out, it wasn't necessarily a statement of the defendant. It was the fact that he found it strange that somebody would go out to Mexico and dive. So how does that cut? I mean, does that mean, therefore, it should be disregarded on a harmless error? Right. It should be. Well, it should be. It is harmless error. No, I'm sorry. Assume we were to rule out the GPS. Could we look to that statement to say that that admission was harmless error because of the statement you've just now referred to, the diving statement, as the other evidence that he was in Mexico? Well, you could, and there's other evidence in the form of a statement that he said that he was in Mexico. That never came out at trial, however, because the government didn't feel the need to elicit it. Well, it was elicited with a record at trial. Right. If we were to conclude the GPS was erroneously admitted, okay, so now we're left with the record of this trial, not stuff that's outside the record. Okay. What do we look to to evidence that this boat came across the border from Mexico? The inspector's testimony that he observed it coming from Mexican waters. In fact, Officer James, despite Helen's characterization of the boat coming in near the Imperial Beach Pier, actually said that he observed it coming in from the far end of Imperial Beach, Tijuana area, is what he said. How far? Actually, he said Tijuana. What distances are we talking about here? Well, I believe at some point in his testimony he said about a mile. So it was a mile from the Imperial Beach? Right, somewhere within a mile from the far end of the Imperial Beach Pier, which I took to mean behind the Imperial Beach Pier, coming north, hugging the coast at a high rate of speed. So it's not like this boat's out wildly in the ocean. It has a clear directional course at a high rate of speed. At least at the time he saw it. At least at the time he saw it. He didn't see it before. Obviously, it could come from anywhere, but when he saw it. Right, when he saw it. It was coming, hugging the shore. Right, from Tijuana area, and the district. But it could have put in from outside the. It's possible, but he did say Tijuana in the district court, I guess implicitly in its finding that the boat came from Mexico, found that that was the testimony. Okay. And I have a minute left, so let me just address, if I could. It's a minute on the negative side. Oh, I'm sorry. I didn't see the stop. I was just going to. The Edmund case is clearly not on point. Seventeen years earlier in Villamonte Marquez, that court, the Supreme Court, echoed the same sentiments that were echoed in Edmund's, and that is that. The internal traffic stop. Right, exactly. The court. That's in your brief. That's in the brief. Okay. What was on this gum sheet? She anticipated why you put it in. Right. That's why you gave it to us. Because the, in district court proceedings, the appellant never made a motion to suppress the evidence based upon the initial stop. It never did. He never made that motion. In fact, I think if you read. Is it correct, though, that you briefed and argued all that below? Well, we argued. No, that's not correct. We argued. I never argued. Let me think about what I. It was so long ago, I can't remember exactly what the argument. I know what the argument was, but we did argue it. But the appellant never raised it as a basis to suppress the evidence. And is this an issue, a waiver issue, that you're raising the first time today by this gum sheet? Or are these just supplemental to something you've already argued? No, this is something that I'm raising today. Tip for tap, huh? Okay. Got it. All right. Thank you. Just briefly, Your Honors. All of the discussion about what's a waypoint, what's a backtrack, what's a trail, all indicates that not only was the GPS not introduced, but there is interpretation performed by the officer in reading the GPS and that it's fairly technical. I mean, who knows? Maybe if Mr. Bennett had been able to look at it, he would have been able to prove to the jury that what Officer Chandler said was a trail of his journey were actually waypoints introduced by some other person at another time. Well, what do you counsels argue, that there was no effort made to produce or request production of the GPS? Well, there was no. I don't believe that there was advance notice that the GPS would be introduced. It's scientific information. You would assume that it would be the sort of information that you would have some sort of notice and expert testimony notice. I don't recall any of that. But you could have requested access to the GPS and tested to see whether it was functioning properly. And this, let me just say, I think that there is some confusion as to what has happened. I can tell you that there is a motion. I can tell you that the government filed a motion to preserve evidence, which is at the clerk's record at 11 and 13. And on page 5 of that motion, the government says that it will preserve all evidence to which the defendant is entitled under the rules. Now, here's where I'm going to talk about things that I'm not positive about. I believe that the government at some point prior to trial got rid of the boat and the GPS. I don't know that for sure. That's my belief based on discussions with the trial attorney and the U.S. attorney in this case. Why didn't you object then to the fact that the GPS was not even available for verification? Oh, I think that the attorney wanted to, Your Honor. He objected on every possible grounds, and then he asked to go sidebar, and the judge said, I won't let you. In my conversation with the trial attorney, he said, I wanted to bring that up at sidebar. That's not on the record. But what is on the record is that he objected on every ground, including the best evidence rule. The best evidence rule should trigger an inquiry by the court requiring the government to bring in that actual physical evidence. And when the judge overruled that, he said, can I come sidebar? And the judge said, no. I don't know what else. It was a best evidence objection. Absolutely. All right. Absolutely. Okay. Thank you, Your Honor. Thank you very much. The case just argued will be submitted. We, again, thank counsel for their good arguments. We have one more case on calendar, Sage v. Canberra. That is submitted on the briefs, and we stand in recess for the day. All rise.
judges: Fisher, Bybee, Mahan